## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF MICHIGAN (GRAND RAPIDS)

| | | |
|---|---|---|
| In Re: | ) | Case No.: 19-00613-jwb |
| | ) | Chapter 7 |
| FULL SPECTRUM MANAGEMENT, LLC, | ) | Hon. James W. Boyd |
| | ) | |
| ___Debtor.___ | ) | |
| | / | |
| | ) | |
| INDEPENDENT BANK, derivatively for and on | ) | Adv. Pro. No.:  20-80059-jwb |
| behalf of KELLY M. HAGAN, Chapter 7 Trustee | ) | |
| for the estate of Full Spectrum Management, LLC, | ) | Hon. James W. Boyd |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S STATEMENT OF** |
| v. | ) | **UNDISPUTED FACTS** |
| | ) | |
| MARK D. NOSS, an individual, MARK D. NOSS, | ) | |
| O.D., L.L.C., a Michigan limited liability company, | ) | |
| d/b/a FULL SPECTRUM EYECARE, MDN | ) | |
| DEVELOPMENT, LLC, a Michigan limited | ) | |
| liability company, SMART SCHOOLS | ) | |
| MANAGEMENT, INC., a former Michigan | ) | |
| corporation, SMART SCHOOLS MANAGEMENT | ) | |
| OF BAY CITY, LLC, a former Michigan limited | ) | |
| liability company, SMART SCHOOLS, INC., a | ) | |
| former Michigan corporation and STEVEN | ) | |
| INGERSOLL, an individual, jointly and severally, | ) | |
| | ) | |
| Defendants. | ) | |
| | / | |

Plaintiff, Independent Bank, derivatively for and on behalf of Kelly M. Hagan, Chapter 7

Trustee for the bankruptcy estate of Full Spectrum Management, LLC, by its attorneys, Clark

Hill PLC, pursuant to the Hon. James W. Boyd's Summary Judgment Procedures, submits this

Statement of Undisputed Facts in support of Plaintiff's motion for partial summary judgment,

supported by the accompanying exhibits.[1]

---

[1] The referenced transcript pages of Dr. Mark D. Noss's Rule 2004 Exam are attached as **Exhibit A**; the referenced transcript pages of Dr. Noss's discovery deposition are attached as **Exhibit B**; the referenced transcript pages of Steven Ingersoll's discovery deposition are attached as **Exhibit C**; the Noss Defendants' Responses to Plaintiff's Second Interrogatories and Requests for Production are attached as **Exhibit D** (without exhibits); and various public documents subject to judicial notice are attached as **Exhibits E-1, E-2 and E-3**.

The following facts are undisputed:

1.      Debtor Full Spectrum Management, LLC ("Debtor" or "Full Spectrum Management" or "FSM") is a Michigan limited liability company. (AP Dkt. No. 35, Answer, ¶ 5).

2.      FSM was formed on March 20, 2014. (AP Dkt. No. 35, Answer, ¶ 5).

3.      At all relevant times, FSM operated a business at 328 Munson Avenue, Traverse City, Michigan 49686. (AP Dkt. No. 35, Answer, ¶ 7).

4.      FSM was established to act as an educational management company and exclusively provided services to Grand Traverse Academy ("GTA"), a charter school located in Traverse City, Michigan. (AP Dkt. No. 35, Answer, ¶ 8).

5.      At all times, Defendant Mark D. Noss ("Dr. Noss" or "Defendant Noss") was the sole member of FSM. (AP Dkt. No. 35, Answer, ¶ 5).

6.      On February 19, 2019 (the "Petition Date"), FSM filed a voluntary Chapter 7 Petition in this court. (AP Dkt. No. 35, Answer, ¶ 6).

7.      On February 20, 2019, Kelly M. Hagan was appointed as the Chapter 7 Trustee for Debtor FSM's assets. (AP Dkt. No. 35, Answer, ¶ 10).

8.      Chapter 7 Trustee Kelly M. Hagan commenced this adversary action on April 30, 2020, by the filing of the Complaint. (AP Dkt. No. 1).

9.      Pursuant to the Court's First Pretrial Order, the Plaintiff in this adversary action is Independent Bank, acting derivatively for and on behalf of Kelly M. Hagan, Chapter 7 Trustee for the bankruptcy estate of Full Spectrum Management, LLC. (AP Dkt. No. 32, p. 2).

10.     Dr. Noss is an adult resident with an address of 2935 Keewaydin Trail, Traverse City, Michigan 49686-8564. (AP Dkt. No. 35, Answer, ¶ 14).

11.     At all times up to the Petition Date, Dr. Noss owned and controlled FSM. (AP Dkt. No. 35, Answer, ¶ 9).

2

12.     At all relevant times, Dr. Noss was a licensed optometrist in the state of Michigan. (Exh. A, 2004 Exam, p. 3).

13.     At all relevant times, Dr. Noss operated his optometry practice through Mark D. Noss, O.D., L.L.C. d/b/a Full Spectrum Eyecare ("Full Spectrum Eyecare"), a named Defendant in this adversary proceeding. (Exh. A, 2004 Exam, p. 5).

14.     Full Spectrum Eyecare is a Michigan limited liability company authorized to conduct business in the State of Michigan.  (AP Dkt. No. 35, Answer, ¶ 15).

15.     At all relevant times, Full Spectrum Eyecare's Resident Agent was Mark D. Noss with a registered office address of 328 Munson Avenue, Traverse City, MI  49686. (AP Dkt. No. 35, Answer, ¶ 15).

16.     FSM and Full Spectrum Eyecare were both operated out of the office at the same address of 328 Munson Avenue, Traverse City, MI  49686. (AP Dkt. No. 35, Answer, ¶¶ 7, 15).

17.     The building located at 328 Munson Avenue, Traverse City, MI  49686 was owned by Dr. Noss personally.  (Exh. A, 2004 Exam, p. 25; Exh. B, Noss Dep., pp. 4-6).

18.     Prior to the formation of FSM on March 20, 2014, Dr. Noss was a member of the Board of Directors of GTA. (AP Dkt. No. 35, Answer, ¶ 23).

19.     Prior to the formation of FSM on March 20, 2014, Defendant Steven Ingersoll ("Ingersoll") managed GTA through Smart Schools Management, Inc., a business entity that Ingersoll owned and controlled. (AP Dkt. No. 35, Answer, ¶ 23).

20.     Other now-defunct business entities owned and controlled by Ingersoll were Defendants Smart Schools, Inc. and Smart Schools Management of Bay City, LLC. (AP Dkt. No. 35, Answer, ¶¶ 22, 23).

21.     Dr. Noss attended optometry school with Ingersoll and they have known each other for over 25 years. (Exh. A, 2004 Exam, pp. 62-63).

22.     Prior to the Petition Date, Dr. Noss and Ingersoll had owned and operated businesses together. (Exh. A, 2004 Exam, p. 74; Exh. B, Noss Dep., pp. 6, 34).

23.     Up until March 2014, Smart Schools Management, Inc. managed GTA pursuant to a written agreement known as an Educational Provider Agreement. (AP Dkt. No. 35, Answer, ¶ 23).

24.     In March 2014, Ingersoll was indicted for tax evasion, leading to his conviction for tax evasion in March 2015.  (AP Dkt. No. 19, Response to Complaint, p. 3 of 5; Exh. C, Ingersoll Dep., p. 82).

25.     In light of the indictment in March 2014, a decision was made for Ingersoll to withdraw as the manager of GTA. (Exh. C, Ingersoll Dep., p. 40).

26.     In March 2014, Dr. Noss, through a new company, at the behest of Ingersoll, agreed to take over management of GTA from Ingersoll and his company, Smart Schools Management, Inc., subject to GTA Board of Director approval. (AP Dkt. No. 35, Answer, ¶¶ 24, 25, 31; Exh. B, Noss Dep., pp. 43-45).

27.     By an email Dr. Noss authored dated March 18, 2014, Dr. Noss informed the GTA Board of Directors that he intended to form a new management company to take over the management of GTA. (AP Dkt. No. 35, Answer, ¶ 25; AP Dkt. No. 1-1, Exh. 1).

28.     The new company formed by Dr. Noss to manage GTA was FSM. (AP Dkt. No. 35, Answer, ¶¶ 5, 8, 23, 25).

29.     Pursuant to his March 18, 2014 email, Dr. Noss informed the GTA Board of Directors that his new management company would assume the "million dollar liability" owed to Traverse City State Bank n/k/a Independent Bank. (AP Dkt. No. 35, Answer, ¶ 25; AP Dkt. No. 1-1, Exhibit 1).

4

30.     Dr. Noss agreed that the GTA-related debts of Smart Schools Management, Inc. would be transferred to his new management company, FSM. (AP Dkt. No. 35, Answer, ¶ 31; Exh. A, 2004 Exam, p. 160).

31.     Pursuant to his March 18, 2014 email, Dr. Noss informed the GTA Board of Directors that his new management company would be "the best possible scenario" and "will allow for the elimination of the TC State debt." (AP Dkt. No. 35, Answer, ¶ 25; AP Dkt. No. 1-1, Exhibit1)

32.     Prior to FSM being formed on March 20, 2014, pursuant to Dr. Noss's request, Traverse City State Bank confirmed to Dr. Noss that the $925,000 loan indebtedness owing to the bank could be transferred to FSM. (Exh. B, Noss Dep., p. 73 and Dep. Exh. 2).

33.     Dr. Noss and Ingersoll exchanged the Technical Information License Agreement for execution on and after April 2, 2014, but back-dated the signatures to March 19, 2014. (Exh. A, 2004 Exam, pp. 92-93; Exh. B, Noss Dep., p. 49 and Dep. Exh. 1).

34.     The Technical Information License Agreement between FSM and Smart Schools, Inc. is dated March 19, 2014, prior to FSM being formed on March 20, 2014. (AP Dkt. No. 35, Answer, ¶ 5; Exh. B, Noss Dep., p. 49 and Dep. Exh. 1).

35.     On March 19, 2014, prior to FSM being formed, Dr. Noss on behalf of FSM issued the first payment under the Technical Information License Agreement in the amount of $5,241.94, which amount was paid to Smart Schools Management, Inc., not Smart Schools, Inc. (Exh. B, Noss Dep., p. 117 and Dep. Exh. 6).

36.     Commencing on April 1, 2014, FSM issued monthly payments of $12,500 per month under the Technical Information License Agreement, which monies were also paid so that Ingersoll could serve as a consultant for Dr. Noss. (Exh. B, Noss Dep., pp. 49, 62-63, 117 and Dep. Exh. 6).

37.     On March 19, 2014, prior to FSM being formed, Dr. Noss on behalf of FSM entered into an Educational Provider Agreement with GTA by which FSM agreed to manage GTA. (Exh. A, 2004 Exam, pp. 45-46; AP Dkt. No. 1-1, page 16 of 90).

38.     On March 20, 2014, FSM by Dr. Noss as the managing member, executed a promissory note in favor of Traverse City State Bank n/k/a Independent Bank in the amount of $925,000. (AP Dkt. No. 35, Answer, ¶ 27; AP Dkt. No. 1-1, page 5 of 90).

39.     On March 20, 2014, FSM by Dr. Noss as the managing member, executed a commercial security agreement in favor of Traverse City State Bank n/k/a Independent Bank to secure the $925,000 indebtedness, granting a lien on all business assets of FSM including all management fees received from GTA. (AP Dkt. No. 35, Answer, ¶ 28; AP Dkt. No. 1-1, page 5 of 90).

40.     FSM managed GTA from March 20, 2014 to August 1, 2017, when FSM was terminated by GTA. (Exh. A, 2004 Exam, pp. 45-46; AP Dkt. No. 1-1, page 16 of 90; Exh. A, 2004 Exam, p. 124).

41.     Defendant MDN Development, LLC ("MDN") is a Michigan limited liability company authorized to conduct business in the State of Michigan. (AP Dkt. No. 35, Answer, ¶ 16).

42.     At all relevant times, Dr. Noss was the sole member of MDN. (AP Dkt. No. 35, Answer, ¶ 16).

43.     Dr. Noss created MDN for the purpose of developing and building a math and science building at GTA, but it was never built. (Exh. A, 2004 Exam, pp. 8, 138-140).

44.     MDN was operated out of the offices at 328 Munson Avenue, Traverse City, Michigan 49686, where Full Spectrum Eyecare and FSM were also located. (Exh. A, 2004 Exam, p. 7; AP Dkt. No. 35, Answer, ¶ 7).

45.     Prior to the Petition Date, FSM extended loans to Dr. Noss personally, to MDN, and to Full Spectrum Eyecare.  (AP Dkt. No. 35, ¶¶ 47, 67-68, 72-74, 77-79).

46.     FSM's loans to MDN were outstanding and due to the Debtor as of the Petition Date. (Debtor's Schedule A/B: Assets--Real and Personal Property (Official Form 206 A/B), Part 11; AP Dkt. No. 35, ¶¶ 47, 67-68).

47.     As of the Petition Date, MDN owed FSM outstanding loan indebtedness in the amount of $99,133.00. (Debtor's Schedule A/B: Assets--Real and Personal Property (Official Form 206 A/B), Part 11; Exh. A, 2004 Exam, pp. 21-23; Exh. B, Noss Dep., pp. 161, 209-211; AP Dkt. No. 35, ¶¶ 47, 67-68).

48.     FSM loans to Dr. Noss personally were outstanding and due to the Debtor as of the Petition Date. (Debtor's Schedule A/B: Assets--Real and Personal Property (Official Form 206 A/B), Part 11; AP Dkt. No. 35, ¶¶ 47, 72-74).

49.     As of the Petition Date, Dr. Noss owed FSM outstanding loan indebtedness in the amount of $28,604.00. (Debtor's Schedule A/B: Assets--Real and Personal Property (Official Form 206 A/B), Part 11; Exh., A, 2004 Exam, pp. 21-23; Exh. B, Noss Dep., pp. 161, 209-211; AP Dkt. No. 35, ¶¶ 47, 72-74).

50.     FSM loans to Full Spectrum Eyecare were outstanding and due to the Debtor as of the Petition Date. (Debtor's Schedule A/B: Assets--Real and Personal Property (Official Form 206 A/B), Part 11; AP Dkt. No. 35, ¶¶ 47, 77-79).

51.     As of the Petition Date, Full Spectrum Eyecare owed FSM outstanding loan indebtedness in the amount of $84,632.00. (Debtor's Schedule A/B: Assets--Real and Personal Property (Official Form 206 A/B), Part 11; Exh. A, 2004 Exam, pp. 21-23; Exh. B, Noss Dep., pp. 161, 209-211; AP Dkt. No. 35, ¶¶ 47, 77-79).

7

52.     As the Manager and sole member and owner of Debtor, Dr. Noss authorized and arranged the loans from FSM to MDN, to himself, and to Full Spectrum Eyecare. (AP Dkt. No. 35, ¶ 47).

53.     As the Manager and sole member and owner of Debtor, Defendant Dr. Noss authorized and arranged for FSM to pay expenses and debts of MDN, Full Spectrum Eyecare and for himself personally.  (AP Dkt. No. 35, ¶ 47).

54.     MDN was funded by Dr. Noss removing money from FSM (Exh. A, 2004 Exam, p. 9).

55.     FSM paid the expenses of MDN, which company was not separately funded. (Exh. A, 2004 Exam, pp. 18-19).

56.     Dr. Noss directed FSM funds to be used for MDN expenses (Exh. A, 2004 Exam, pp. 20, 23).

57.     MDN used office space in Dr. Noss's building, but MDN did not have a lease or pay rent for that usage.  (Exh. A, 2004 Exam, pp. 32-33).

58.     MDN also used the staff of Full Spectrum Eyecare. (Exh. A, 2004 Exam, p. 8).

59.     Dr. Noss's bookkeeper, at his direction, would use FSM funds to pay his personal bills and the expenses of his other companies since those companies were allegedly not generating any income. (Exh. B, Noss Dep., p. 110).

60.     Since his earnings as an optometrist at Full Spectrum Eyecare allegedly decreased to zero, Dr. Noss began taking draws or distributions from FSM in May 2014 to pay "his personal expenses" which draws amounted to $435,000 in 2014.  (Exh. A, 2004 Exam, pp. 121-122; Exh. B, Noss Dep., pp. 115-116).

61.     Dr. Noss initially used Ingersoll's daughter, Gretchen Ingersoll, as the bookkeeper for FSM. (Exh. A, 2004 Exam, pp. 16-17; Exh. B, Noss Dep., p. 109).

8

62.     Dr. Noss regularly directed Gretchen Ingersoll to issue draws to him or transfer funds from FSM to Dr. Noss personally, or to his companies, to pay his personal expenses and those companies' obligations because they were not generating any income. (Exh. B, Noss Dep., pp. 109-110).

63.     With respect to the formation and management of MDN, Dr. Noss took his advice from Ingersoll.  (Exh. B, Noss Dep., pp. 155-156).

64.     MDN's business activities were funded by FSM, with no formal loan or other documentation. (Exh. B, Noss Dep., p. 157).

65.     MDN had absolutely no assets, no cash, and it was put together with FSM money as well as Dr. Noss's own funds. (Exh. B, Noss Dep., p. 157).

66.     Everything removed from FSM's bank accounts was done at Dr. Noss's direction. (Exh. B, Noss Dep., pp. 160-162).

67.     Dr. Noss made the decision to use funds from FSM to fund MDN and the building project for GTA. (Exh. A, 2004 Exam, pp. 23-24).

68.     Dr. Noss did not inform the GTA Board that he was using FSM funds to fund MDN. (Exh. B, Noss Dep., p. 208).

69.     No documents were prepared to memorialize the loans from FSM to Dr. Noss personally. (Exh. B, Noss Dep., pp. 209-210).

70.     With respect to loans from FSM, no loan documents or other supporting documents were prepared. (Exh. B, Noss Dep., pp. 210-211).

71.     Rather than pay FSM's creditors, Dr. Noss used FSM funds to pay personal expenses and to otherwise support himself.  (Exh. B, Noss Dep., p. 212).

72.     Dr. Noss did not have an office expense reimbursement agreement or other agreement between FSM and Full Spectrum Eyecare for FSM's use of the Full Spectrum Eyecare

office equipment, supplies or the payment of other administrative expenses. (Exh. A, 2004 Exam, pp. 24, 40, 44).

73.    At times, FSM paid Full Spectrum Eyecare's payroll. (Exh. A, 2004 Exam, pp. 118-121).

74.    Dr. Noss does not know what corporate formalities were followed for Full Spectrum Eyecare. (Exh. B, Noss Dep., pp. 23-34).

75.    Since Dr. Noss was allegedly not making money as an optometrist with Full Spectrum Eyecare, he took membership draws from FSM as soon as it was formed.  As characterized by Dr. Noss himself, he was "just flying by the seat of my pants." (Exh. B, Noss Dep., p. 107).

76.    Although during 2014 Dr. Noss continued to work at Full Spectrum Eyecare, the business did not generate enough revenue to pay him.  For that reason, he took draws from FSM to pay his own personal expenses since he did not have another source of income. (Exh. B, Noss Dep., p. 116).

77.    No documents were prepared to memorialize the loans from FSM to Dr. Noss personally. (Exh. B, Noss Dep., pp. 209-210).

78.    No documents were prepared to memorialize the loans from FSM to Full Spectrum Eyecare. (Exh. B, Noss Dep., pp. 209-210).

79.    FSM was terminated by GTA as manager of the academy on August 1, 2017. (Exh. A, 2004 Exam, pp. 141-142).

80.    After GTA terminated FSM, FSM could no longer pay the debts owing to Independent Bank and other creditors. (AP Dkt. No. 35, ¶¶ 52-53).

81.    Full Spectrum Eyecare has no operating agreements, no member interest agreements, no subscription agreements, no membership purchase agreements, no assignments, no

minutes of member meetings, no minutes of board of manager meetings, no LLC resolutions, and no record books. (Exhibit D, Response to Interrog. No. 1, p. 4).

82.     MDN has no member interest agreements, no subscription agreements, no LLC resolutions, and no record books.  (Exhibit D, Response to Interrog. No. 2, pp. 4-5).

83.     Full Spectrum Eyecare has no documents that evidence promissory notes or loans with FSM. (Exhibit D, Response to Interrog. No. 1, p. 4).

84.     MDN has no documents that evidence promissory notes or loans with FSM. (Exhibit D, Response to Interrog. No. 2, pp. 4-5).

85.     On October 25, 2017, Comstock Construction Company, as Plaintiff, filed suit in the Grand Traverse Circuit Court, Case No. 17-32334-CK, against Grand Traverse Academy, FSM, MDN, and Dr. Noss, as Defendants, for collection. (**Exhibit E-1**, Judicial Notice: Case No. 17-32334-CK, Complaint).

86.     In Case No. 17-32334-CK, Grand Traverse Academy settled with Comstock Construction Company for $75,000, which amount was paid. (Exh. A, 2004 Exam, pp. 141-142; Exh. B, Noss Dep., p. 213).

87.     In Case No. 17-32334-CK, state court defendants FSM, MDN, and Dr. Noss, jointly and severally, settled with Comstock Construction Company pursuant to a mutual release of claims and agreed to pay the total amount of $51,500 in irregular, annual installments due on September 30 of 2018, 2019, and 2020. (Exhibit D, Noss Defendants' Document Production 12/21/22, pp. 000938-000939).

88.     By stipulation of all parties, Case No. 17-32334-CK was dismissed with prejudice on September 4, 2018. (**Exhibit E-2**, Judicial Notice: Case No. 17-32334-CK, Order of Dismissal).

89.     In FSM's Chapter 7 bankruptcy case pending in this Court, Case No. 19-00613-jwb, Comstock Construction Company filed a Proof of Claim dated July 12, 2019, Claim #2, in

the amount of $51,500 for the unpaid settlement amount.  (**Exhibit E-3**, Judicial Notice: Case No.: 19-00613-jwb, Proof of Claim #2).

Respectfully submitted,

**CLARK HILL PLC**
Attorneys for Plaintiff

Dated:  January 27, 2023                    By:  ___/s/ Sandra S. Hamilton_____
                                                      Sandra S. Hamilton (P41980)
                                                      David W. Centner (P43071)
                                            Business Address & Telephone:
                                                      200 Ottawa Ave NW, Ste. 500
                                                      Grand Rapids, MI  49503
                                                      (616) 608-1141
                                                      Email: bankruptcyfiling@clarkhill.com